UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CHARLES B. GILL,

Plaintiff,

v. Case No. 18-cv-540-pp

ARAMARK CORRECTIONAL SERVICES, *et al.*,

Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION TO FILE SUR-REPLY BRIEF (DKT. NO. 96), DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 55), GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT NOS. 59, 60) AND DISIMISSING CASE**

---

On April 6, 2018, the plaintiff, representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. Dkt. No. 1. The court issued a screening order directing the plaintiff to file an amended complaint by October 12, 2018. Dkt. No. 12. The court received that amended complaint on September 20, 2018. Dkt. No. 13. The court screened the amended complaint and allowed the plaintiff to proceed on a First Amendment free exercise claim and claims under the Religious Land Use and Institutionalized Persons Act ("RLUPIA"). Dkt. No. 15. The parties filed cross-motions for summary judgment, dkt nos. 55, 59 and 60, with defendant Lieutenant Verheyen filing a separate motion from defendants Aramark Correctional Services, Michelle Hare, Thomas Hare, and Jeni N. Munns ("Aramark Defendants"). The plaintiff also filed a motion for leave to file a sur-

reply brief. Dkt. No. 96. The court will grant the plaintiff's motion for leave to file a sur-reply brief, deny the plaintiff's motion for summary judgment, grant defendants' motions for summary judgment and dismiss the case.

## I. FACTS

### A. The Parties

The plaintiff was an inmate at the Outagamie County Jail from November 2, 2017 to August 20, 2018. Dkt. No. 69 at ¶3. Defendant Verheyen was an employee of the jail during the events described in the complaint. Id. at ¶1. Defendant Aramark Correctional Services is the contractor responsible for inmate meals at the jail. Dkt. No. 63 at ¶1. Defendants Thomas Hare, Michelle Hare and Munns are employees of Aramark. Dkt. No. 44.

### B. Plaintiff's Request for Halal Meals

On January 17, 2018, the plaintiff submitted a question through the jail's Offender Management System computer kiosk system ("OMS system") asking whether the kitchen served Halal meals. Dkt. No. 69 at ¶6. The plaintiff received a response directing him to ask Verheyen, who "often handles special diet requests." Id. On January 23, 2018, the plaintiff submitted a "general request" through the OMS system asking to switch to a Halal diet. Id. at ¶7. (The plaintiff also indicated that while he'd been in custody during Ramadan the previous year, he hadn't requested a special meal then because he expected to be released soon. Id.) In his request, the plaintiff stated that he'd "talked to medical," who'd sent him to the chaplain, who'd sent him to Verheyen, but that

he'd not gotten a response. Dkt. No. 62-2. Verheyen asserts that on January 24, 2018, he evaluated and approved "a special religious Halal diet for Inmate Gill." Dkt. No. 62 at ¶11; Dkt. No. 62-4.

The next day, the plaintiff filed an inmate grievance, number 18-023, stating that he had written to Verheyen asking for an "Islamic Diet" Dkt. No. 62-3. The plaintiff explained that the kitchen had sent him a vegan diet; he explained that vegan and Halal diets were not similar and that "Muslims still eat meat." Id. He also complained that "the kitchen and Aramark is taking my religion and my diet as a joke. What they sent me was not blessed by an Imam nor was it properly prepared. . . . It was rice, beans, salad, and bread. There is nothing Islamic about that." Id. The plaintiff reiterated his request for a Halal diet. Id. Sgt. Hinze (not a defendant) responded to the grievance, stating that "Aramark is working to find options. Until options, supply and cost can be worked out and resolve your issue, a vegan diet is your only option. Should take about 2 weeks." Id.; Dkt. No. 69 at ¶16.

In January 2018, Verheyen and other jail personnel had "discussions" with the plaintiff "as to his specific religious beliefs; Verheyen says that the plaintiff "insisted that his religious beliefs required that he consume some meat as part of a Halal diet." Dkt. No. 62 at ¶9. Attached to Verheyen's declaration are written communications between the plaintiff and Lieutenant Wirtz.[1] Dkt.

[1] The plaintiff originally named Wirtz as a defendant but later filed a motion amending the parties and excluding Wirtz. Dkt. No. 6.

No. 68-1. On January 26, 2018, the plaintiff stated that "a Vegan diet is not what my diet consists of. So therefore they are violating me. . . . 24 years as a Muslim and never have I had someone substitute a Vegan diet for a Halal diet." Dkt. No. 68-1 at 1. He also stated that he was fasting "until they correct my meal" and "filing the 1983." Id. Wirtz responded that it had been only a few days since the plaintiff "demand[ed] a Halal diet" and noted that he "gave us what . . . 3 days to comply completely or you're going to file a 1983?" Id. Wirtz also stated that he did not believe the plaintiff had enough to file a federal case and that "[w]e've shown a willingness to work with you and are continuing to seek a solution that is both practical and respectful of your rights." Id. He concluded his response by asking the plaintiff to be patient. Id.

Two days later, the plaintiff sent another request through the OMS system asking Wirtz "or someone from the kitchen come and talk to me so that I can show you in the Qur'an what my diet is to consist of." Id. at 2. He provided details about his fast, stating that he was refusing to eat because the meals provided were "not what a Halal diet consists of . . . ." Id. Wirtz responded that he had "learned what is constitutionally required of correctional institutions regarding providing Halal diets to inmates who request them," again noted that the jail was "working toward a solution that is both practical and respectful of your rights," said he intended to come speak with the plaintiff that week and again asked for the plaintiff's patience. Id.

The plaintiff was the first inmate at the jail to make "a request for a meat

based Halal diet;" prior inmates who'd asked for Halal diets received vegan meals. Dkt. No. 69 at ¶11. So jail staff researched how to accommodate the plaintiff's request for a Halal meal with meat. Id. at ¶17. They considered ways to add meat to the meals, and what that would cost; they included discussions with the plaintiff, with Aramark personnel and with larger jails and prisons that regularly housed Muslim inmates. Id. As part of the investigation, they reviewed Aramark's 2017 ACS Medical Nutritional Therapy and Religious Meals Manual, which, the defendants indicate, says that a vegan diet (totally vegetarian) "may be applicable to Halal, Kosher, and other religious types as determined by the facility administrator or religious authority." Id. at ¶18. The jail administration also talked with Kelli West from the Wisconsin Department of Corrections, who informed them that the DOC's policy and practice was to provide Halal meat at four meals per week along with a vegan diet. Id. at ¶19. They also looked into the cost of providing Halal meat and determined that it would cost "an additional $212.43 above and beyond what the County was already paying Aramark pursuant to its contract for food services." Id. at ¶22. In addition to the increased cost, the jail administration considered the projected costs if more inmates began requesting Halal meat at every meal. Id. at ¶23.

The plaintiff disputes these facts, not because they did not happen, but because he says that the DOC and Aramark's manual do "not govern [his] religious beliefs." Dkt. No. 81 at ¶¶18, 19, 24. Specifically, he alleges that a

"vegan diet requires [him] to engage in conduct that seriously violates [his] religious beliefs—forgoing meat provided by Allah." Id. at ¶¶ 24, 27-30. He states that he asked to show to Verheyen and the Aramark defendants the specific parts of the Qur'an that mandate he must eat Halal meat but none of the defendants ever came to have that conversation with him. Id. at ¶39. The plaintiff also explains in his response to Verheyen's proposed findings of fact what the plaintiff believes constitutes a Halal meal:

> At a minimum, the meat must be certified Halal, and the vegetables need to be Halal or at least organic. The packaging of properly certified Halal food bears the letter "H" or "M" and the symbol of a crescent moon. The only way Muslims can be certain that a particular food is Halal, is by reviewing a list of the ingredients and seeing that it is certified with the letter "H" or "M" and a crescent moon. The other ways of identifying Halal/Kosher foods is to look for "J" or "K" for Kosher, and a list of the ingredients for his review.

Id.at ¶67. He offers no support for these assertions but also notes that the defendants never provided him proof that his meals were Halal. Id. He argues that having Halal meat once a day would satisfy his beliefs. Id. ¶20.

At some point between February 2, 2018 and February 16, 2018, the jail kitchen began providing the plaintiff with Halal meat four times a week. Dkt. No. 69 at ¶29. The plaintiff confirms that he received meals with Halal meat on Sunday, Monday, Wednesday and Friday at lunch only. Dkt. No. 80 at ¶13.

On February 16, 2018, the plaintiff sent another request through the OMS system that states, "Starve before I give Aramark, and this jail the satisfaction of beating me. Trust me, my family from the east will not be happy

with this jail. I don't think this jail can handle another lawsuit, never the less a wrongful death suit. OCJ now has the ball." Dkt. No. 68-1 at 3. Wirtz responded,

> You are receiving a vegan diet that is supplemented with Halal meat on four meals per week. That is our jail's offering for inmates who request Halal diets. It is in line with the Wisconsin DOC and other jails in the state who regularly house Muslim inmates. We listened to your requests, researched the requirements of a Halal diet, checked with larger jails/prisons who regularly house Muslim inmates and made a change to improve how we accommodate Muslim inmates who request Halal diets.

Id. (emphasis in original). That same day, Verheyen responded to a letter sent by the plaintiff, explaining the reasoning behind providing Halal meat with a vegan diet four times per week, opining that a vegan diet did not violate the principles of Halal and describing what the jail had done to accommodate other requests by the plaintiff (such as providing him with a kufi cap and a second towel to use as a prayer rug). Dkt. No. 62-5. Though none of the parties say so, it appears that the plaintiff continued to receive a vegan diet supplemented four times a week with Halal meat for the remainder of his incarceration at Outagamie County Jail.

C. Aramark's Role in Fulfilling Plaintiff's Requests

The Aramark defendants state that Aramark does not approve or disapprove an inmate's religious diet request and does not have the ability to cancel dietary orders. Dkt. No. 63 at ¶3. The Aramark defendants assert that they implement the dietary orders as directed by Outagamie County Jail. Id. at

¶4. After the jail approves a Halal or kosher diet for an inmate, Aramark provides a cost estimate for the diet and other useful information, such as potential issues in obtaining the requested food. Id. at ¶9. The jail reviews the information and makes a final decision on the proposal. Id. at ¶10. At that point, the proposed diet is sent to Aramark's registered dietician who reviews the diet and determines whether it will be nutritionally sufficient. Id. Once that step is complete, Aramark begins providing the new diet to the inmate. Id.

When a request for Halal meals for inmates comes in from an institution, Aramark states that it follows the guidelines issued by the Academy of Nutrition to create meals that are nutritious and comply with Halal dietary tenets. Id. at ¶5. Aramark asserts that it "does not offer or serve Halal inmates food that does not comply with Halal dietary requirements." Id. at ¶6. It also contends that the vegan meals do not violate Halal or kosher dietary tenets, and there is nothing in the guidance on Halal meals suggesting that people who follow Halal meal requirements must consume meat. Id. at ¶7. While Aramark asserts that it makes sure the meals themselves comply with religious tenets, it also states that it "does not play any role in determining whether a revised diet requested and approved by [the jail] is necessary to comply with any religious dietary tenets." Id. at ¶12. The plaintiff implies that this statement is confusing. Dkt. No. 80 at ¶12. The court reads the statement to mean that it is the jail that decides if a religious diet is necessary for a particular inmate, and it is Aramark that then provides a religious diet that

meets the accepted tenets of that religion for inmates the jail agrees need such a diet.

According to the Aramark defendants, to try to accommodate the plaintiff's demands, the jail staff conducted an investigation to determine how to add Halal meat to his meals regularly. Dkt. No. 63 at ¶14. The jail asked about the cost of adding Halal meat to the vegan diet the plaintiff was receiving. Id. at ¶15. In response, Aramark sourced Halal meat and its registered dietician reviewed the proposed inclusion of the meat to ensure that the resulting meal met nutritional standards. Id. at ¶16. Aramark then informed the jail how much the inclusion of meat would cost, and the jail approved adding Halal meat "regularly" to the plaintiff's vegan meals three times per week.[2] Id. at ¶17.

The plaintiff does not dispute Aramark's process or policy. As with Verheyen, he takes issue with how the Aramark defendants define Halal. Specifically, he states that "The Academy of Nutrition cannot dictate my religious beliefs," and asserts that he invited Aramark, Thomas Hare, Michelle Hare and Munns to come read portions of the Qur'an, but that they didn't

---

[2] The court notes that both the plaintiff and Verheyen state that the plaintiff received meat four times a week. Dkt. No. 69 at ¶20; Dkt. No. 80 at ¶13. Reviewing Verheyen's February 16, 2018 letter to the plaintiff, it appears that the plaintiff notified Verheyen that the kitchen believed the plaintiff was to receive Halal meat every other day. Dkt. No. 62-5. Verheyen states that he clarified with the kitchen that the plaintiff should be getting Halal meat four times per week. Id. After February 16, 2018, it appears the plaintiff was receiving Halal meat four times per week. Dkt. No. 69 at ¶20; Dkt. No. 80 at ¶13

come. Dkt. No. 80 at ¶¶5, 7. He asks why Aramark hasn't provided the court or him "with vegetables labels with the halal symbol on them? Id. at ¶7. He insists that a vegan diet violates his religious beliefs, "forgoing meat provided by Allah." Id. at ¶8. The plaintiff also disputes that receiving meat three times per week is a "regular basis," and he should have been receiving meat every day.[3] Id. at ¶¶ 17, 20.

D. Plaintiff's Grievances Related to His Meals

The jail has a grievance procedure in its inmate handbook that details how inmates can file complaints. Dkt. No. 69 at ¶¶41-44; Dkt. No. 62-7 at 14-15. The procedure requires that inmates try to informally resolve their complaint first by discussing it with a staff member. Id. If that fails, the inmate may file a grievance within seven days of the event causing the grievance. Id. Inmates may only include one complaint per grievance. Id. Jail staff will investigate and render a decision within fourteen days. Id. Verheyen stated in his proposed findings of fact that "[i]f an inmate is unhappy with the response to his grievance, an inmate has the option to appeal." Dkt. No. 69 at ¶44. The plaintiff disputes this, asserting that "[t]here is no way to file an appeal for a grievance that was sustained." Dkt. No. 81 at ¶62. The procedure itself states that "[i]f a grievance is denied an appealed [*sic*] on two levels. Level 1 will be responded to within seven (7) calendar days and level 2 within 10 calendar

[3] Again, the record indicates that the plaintiff received Halal meat four times per week. But it makes little difference—the plaintiff asserts that he needed to have Halal meat once a day. Dkt. No. 80 at 20.

days." Dkt. No. 62-7 at 15. A Level 2 appeal appears to be a mechanism by which an inmate can appeal a Level 1 appeal denial. Id. Verheyen asserts that the plaintiff received the inmate handbook at booking. Dkt. No. 69 at ¶41.

The plaintiff filed seventeen meal-related grievances between January 24 and June 22, 2018. Dkt. No. 69 at ¶¶45-62. In two of those seventeen grievances, the plaintiff complained about receiving only vegan meals instead of Halal meals: grievance number 18-023 filed January 24, 2018, and grievance number 18-025 filed January 26, 2018. Id. See also Dkt. Nos. 62-3 and 62-8. The inmate complaint reviewer sustained grievance number 18-023. Dkt. No. 62-3. The reviewer wrote that Aramark was working "to find options," and that until "options, supply and cost" could be "worked out and resolve[d]," the plaintiff's only option was to get a vegan diet; the reviewer speculated, "[s]hould take about 2 weeks." Dkt. No. 62-3. At the top of grievance number 18-025, someone wrote, "2nd Grievance." Dkt. No. 62-8. At the bottom, in the "response" section, someone wrote, "Resolved 18-023." Id.

In two more grievances, the plaintiff complained about not receiving milk with his vegan meals. Dkt. No. 69 at ¶¶49, 60. In grievance 18-036 filed February 15, 2018, he specifically complained that "for the past thirteen days my breakfast has been coming to me without milk and a spoon. Yes, I am Muslim. Yes, I am getting a Halal diet. So therefore I DO eat meat and dairy products." Dkt. No. 62-11 (emphasis in original). Jail staff denied the grievance, noting that the plaintiff was receiving four Halal meals per week with

the rest being vegan, but indicated that they notified the kitchen to give the plaintiff a spoon. Id. The plaintiff filed a Level 1 appeal on the grievance, which Wirtz denied. In his denial, Wirtz stated that

> neither Aramark nor Outagamie County considers you a Vegan. But that is not the issue. We understand completely that you're Muslim and that you've requested a Halal diet. To meet Halal guidelines does not require that we offer you every food type that Halal allows, it only requires that we provide you with meals that contain required caloric intake and do not violate Halal rules. Nothing in the Vegan diet violates Halal rules.

Id. There is no evidence in the record that the plaintiff appealed this Level 1 denial to Level 2. On June 18, 2018, the plaintiff again filed a grievance, complaining that while had had received milk with breakfast during the month of Ramadan, once Ramadan ended, the kitchen had reverted to not giving him milk at breakfast. Dkt. No. 62-22. Jail staff marked this grievance "resolved," indicating "[g]etting his milk, verbally spoke w/inmate he said matter is resolved." Id.

One more grievance, number 18-034 filed February 15, 2018, complained that the plaintiff had agreed with Verheyen, Wirtz and Hintz that his trays were supposed to alternate between beans one day and peanut butter the next. Dkt. No. 62-10. The plaintiff asserted that "Aramark still is violating DAI 309 for DOC. Food service will ensure the Halal meat diet will comply with Halal requirements. The Halal meat will be served 4 times weekly. The 8, 10, and 13 were the only days I received meat in a 7 day period." Dkt. No. 62-10. The plaintiff asked for "Aramark to start following DAI 309 for DOC regulations

for Halal diets. Yes I filed a 1983 civil suit against them and this can now be considered retaliation. I am not Vegan." Id. The grievance was rejected because "steps 1, 2, 3, 6 not completed." Id. Verheyen states that jail staff rejected the grievance because the plaintiff failed to follow grievance procedure. Dkt. No. 69 at ¶48. It appears that Verheyen informally resolved the portion of this grievance that related to Halal meat and communicated his resolution to the plaintiff in his February 16, 2018 letter. See n.2, supra; Dkt. No. 62-5.

The plaintiff's other grievances dealt either with the general quality of the food (not related to whether the meal was vegan or Halal, just whether the food was in good condition) or the conditions under which the plaintiff received the food (*e.g.,* on a dirty tray.) The only notable grievances out of this bunch are grievances 18-028, 18-061 and 18-047; after jail staff denied those grievances, the plaintiff completed both a Level 1 and a Level 2 appeal. See Dkt. Nos. 62-9, 62-13 and 62-15.

## II. DISCUSSION

### A. Plaintiff's Motion to File Sur-Reply

The plaintiff filed a motion seeking leave to file a sur-reply to both defendants' reply briefs supporting their motions for summary judgment. Dkt. No. 96. Generally, the court does not favor sur-replies. The court's local rules provide for a motion, a response and a reply. Civil Local Rules 7(a)-(c) (E.D. Wis.) In the context of summary judgment, "collateral motions" are "disfavored." Civil L.R. 56(9). Courts in this district routinely disallow sur-reply

briefs. Reed v. Common Bond, LLC, No. 18-cv-263, 2019 WL 1116949, at *2 (E.D. Wis. Mar. 11, 2019) (citing Boustead v. Baranick, 151 F.R.D. 102, 106 (E.D. Wis. 1993); Nalco Chem. Co. v. Hydro Tech., Inc., 809 F. Supp. 672 (E.D. Wis. 1992)). If a party wishes to file a collateral pleading such as a sur-reply, Civil L.R. 7(i) requires the party to file the pleading "as an attachment to a motion requesting leave to file it." Id. at *3.

On December 23, 2019, the plaintiff filed a two-page document titled "Motion to Procee[d] with a Sur-Reply." Dkt. No. 96. He asked to be allowed to file a sur-reply to argue that "the right to a meat-based diet that meets the requirements of my religious beliefs was in fact clearly established at the time of this incident in 2018." Id. at 2. The pleading cited a case in support of this argument.[4] Id. at 1-2. A week later, the court received from the plaintiff a letter indicating that he may have made a mistake in filing the motion to be allowed to sur-reply, and he asked the court to strike that motion. Dkt. No. 97. That same day, the court received a document titled "Plaintiff's Response to Defendans [*sic*] Replt [*sic*] Brief in Support of Motion for Summary Judgment." Dkt. No. 98.

[4] The plaintiff cited Jones v. Comm'r, Ind. Dept. of Corr., No. 16-cv-2887-WTL-MJD, 2017 WL 3398002 (S.D. Ind. Aug. 8, 2017). There, the district court for the Southern District of Indiana granted injunctive relief to a Muslim plaintiff who argued that being denied meat violated his religious beliefs. The court notes that not only is that decision not binding on this court, but the plaintiff in Jones was *not* receiving *any* meat—he was receiving a vegetarian diet designed to meet kosher requirements. Id. at *1. The plaintiff in this case received Halal meat four times a week.

District courts are obligated to treat *pro se* submissions leniently, see Grady v. Hardy, 826 F.3d 1000, 1005 (7th Cir. 2016), and it appears that the plaintiff originally asked the court's permission to file his sur-reply, as Civil L.R. 7(i) required him to do. It is within the court's discretion whether to grant such a motion. "The decision to permit the filing of a surreply is purely discretionary . . . ." Merax-Camacho v. U.S., 417 F. App'x 558, 559 (7th Cir. 2011). Thus, although sur-replies are disfavored, and though the sur-reply doesn't address issues raised for the first time in the defendants' reply (which is the usual reason courts allow sur-reply briefs), the court will treat Dkt. No. 96 as the plaintiff's motion to file a sur-reply brief, will grant that motion and will treat Dkt. No. 98 (which directly addresses the issue of exhaustion of administrative remedies and will assist the court in evaluating the case) as the plaintiff's sur-reply.

B. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Id.

C. Exhaustion of Administrative Remedies

While all defendants raised exhaustion of administrative remedies as an affirmative defense in their answers, dkt. nos. 28, 30, only defendant Verheyen argued the issue in his brief in support of his motion for summary judgment, dkt. no. 72 at 10-12. Because the Aramark Defendants were acting under color of state law, given that Aramark is a private company contracted by Outagamie County to provide food services to the inmates, the court's analysis regarding whether the plaintiff exhausted his administrative remedies applies to all defendants. See Nelson v. Aramark Food Service, No. 18-c-614, 2018 WL 2135019 at *2 (E.D. Wis. May 9, 2018) (holding that "[a]lthough Aramark is a private company, it can be held liable under §1983 as a state actor to the extent that it has assumed the County's constitutional obligation to provide a safe and nutritionally adequate diet to the inmates").

1. *Exhaustion Standard*

The Prison Litigation Reform Act provides in part that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). The exhaustion requirement applies both to the plaintiff's First Amendment claim and his claim under RLUIPA.

The exhaustion requirement gives prison officials an opportunity to

resolve disputes concerning the exercise of their responsibilities before being haled into court, and it produces a "useful administrative record" for the district court to rely on. See Jones v. Bock, 549 U.S. 199, 204 (2007) (citing Woodford v. Ngo, 548 U.S. 81, 94-95 (2006)). The exhaustion requirement also promotes efficiency, because claims generally are resolved more quickly by an agency than through litigation in federal court. Woodford, 548 U.S. at 89.

The Seventh Circuit "has taken a strict compliance approach to exhaustion." Dole v. Chandler, 438 F.3d 804, 809 (7th Cir. 2006). A prisoner must "properly use the prison's grievance process prior to filing a case in federal court." Id. "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." Pozo v. McCaughtry, 286 F.3d 1022 (7th Cir. 2002). "It is well established that 'a suit filed by a prisoner before administrative remedies have been exhausted must be dismissed . . . [and] the district court lacks discretion to resolve the claim on the merits.'" Barnes v. Briley, 420 F.3d 673, 676 (7th Cir. 2005) (quoting Perez v. Wis. Dept. of Corr., 182 F.3d 532, 535 (7th Cir. 1999)).

2. *Analysis*

The jail has a detailed procedure in its inmate handbook setting out what inmates must do to address their grievances. Dkt. No. 62-7 at 14-15. While there is a limited exception to the exhaustion requirement where "dead end"

procedures or extremely "opaque" procedures render the grievance process unavailable, see Ross v. Blake, 136 St. C. 1850, 1859 (2016), the process at issue here is straightforward. First, the inmate must attempt to informally resolve the issue. Dkt. No. 62-7 at 14-15. If that fails, he may file a written grievance within seven days. Id. If the grievance is denied, there are two levels of appeals that the plaintiff must undertake. Id.

The plaintiff was familiar with the jail's process; he filed seventeen meal-related grievances in a six-month period. Dkt. No. 69 at ¶¶45-62. He took three of those grievances through the Level 2 appeal process: numbers 18-028, 18-061, and 18-047. Id. at ¶¶ 47, 51, 53. He knew what the jail required of him and he has presented no evidence that the process was not available to him.

The question is whether any of those grievances properly exhausted his administrative remedies for the relatively narrow claims at issue here—whether the meals the defendants served the plaintiff violated his religious beliefs. Only two of those seventeen grievances specifically complained that the meals were not Halal—numbers 18-023[5] and 18-025. Dkt. Nos. 62-3 and 62-8. The

[5] This is the grievance which the plaintiff asserts sufficed to exhaust his administrative remedies. Dkt. No. 98 at 2. He disputes the defendants' assertion that he didn't appeal the resolution of that grievance, noting that the jail *sustained* that grievance—agreed that he had a valid complaint. Id. He asks, reasonably, why he would appeal a grievance that was resolved in his favor. Id. The court agrees with the plaintiff that the issue isn't that he failed to appeal the resolution of complaint number 18-023. The issue is that after the jail *resolved* that complaint by providing him with Halal meat at four meals per week, he did not file a grievance challenging that resolution. Even the plaintiff in Jones v. Carter, 915 F.3d 1147 (7th Cir. 2019), the Seventh Circuit case holding that refusal to provide a Muslim plaintiff whose religious beliefs

plaintiff filed those grievances on January 24 and January 26, 2018 respectively, during the period that the jail was working with Aramark to find a meal solution that included Halal meat. Id. In responding to the first of those complaints, jail officials concluded that they had resolved the grievance because they were working with Aramark to craft a solution. Id. It is undisputed that the jail officials did not finalize the solution until the middle of February 2018 when they decided to add Halal meat to the plaintiff's meal four times a week. Dkt. No. 69 at ¶29.

The crux of the plaintiff's First Amendment and RLUIPA claims is that the solution that the jail implemented in February 2018 still violated his religious beliefs because it allowed the plaintiff to have Halal meat only four times a week, rather than once a day. The remainder of his meals were vegan, which the plaintiff contends were not Halal. Because he filed grievance numbers 18-023 and 18-025 prior to the implementation of the February 2018 solution, they do not constitute efforts by the plaintiff to exhaust his administrative remedies; those complaints resulted in the plaintiff receiving Halal meat four times a week. For the plaintiff to have exhausted his administrative remedies, he would have had to file a grievance *after* the jail implemented the practice of serving him Halal meat for four meals a week, and

---

required him to eat meat "did not take the position that he need[ed] to eat meat with every meal," arguing only that he "believe[d] it must be a regular part of his diet." Jones, 915 F.3d at 1148. The plaintiff in this case received Halal meals four times a week.

he would have needed to complain about the fact that four times a week was not sufficient.

There is no evidence that plaintiff filed such a grievance. While there is ample evidence in the record that the plaintiff attempted to informally resolve the lack of daily Halal meat through various conversations with jail and kitchen staff and messages sent through the OMS system, these efforts do not satisfy the exhaustion requirement. Exhaustion under the PRLA "requires 'proper exhaustion' meaning that the plaintiff must use the [jail's procedure] in accordance with the applicable procedural rules." Dye v. Bartow, No. 06-c-0634, 2007 WL 3306771 at *5 (E.D. Wis. Nov. 6, 2007) (quoting Woodford, 548 U.S. at 93). In Dye, the court found that health services request forms that complained about the plaintiff's medical conditions did not satisfy the requirement to file a grievance that comported with Wisconsin DOC requirements. Id. Informal conversations that this plaintiff had with jail officials, kitchen staff, and/or through the OMS system do not satisfy the requirement for him to file a grievance under to the jail's process.

Additionally, none of the meal-related grievances filed between February and June 2018 satisfied the exhaustion requirements. Grievance 18-036, filed on February 15, 2018, came close when the plaintiff complained about the lack of milk with breakfast (presumably as a result of getting a vegan diet). Dkt. No. 62-11. But there is no evidence that the plaintiff appealed the denial of this grievance through the Level 2 process. Similarly, grievance number 18-034,

also filed on February 15, 2018, touches on the fact that Aramark was not complying with Halal standards, but the plaintiff complained that Aramark was not complying with the DOC regulations requiring Halal meat four times a week; he wasn't complaining about the fact that he was getting Halal meat *only* four times a week, but was complaining that the jail wasn't complying with that four-times-a-week requirement. Dkt. No. 62-10. In other words, he was demanding that the jail comply with the policy it had implemented, not complaining about that policy. Jail staff rejected this grievance because it did not follow the grievance procedure, which is not an obstacle to an inmate's exhaustion of administrative remedies. See Ghashiyah v. Wis. Dept. of Corr., No. 01-c-10, 2006 WL 2845701 at *10 (September 29, 2006) (holding that rejecting a grievance for failing to follow the institution's procedural rules does not render the administrative remedy unavailable). The plaintiff could have corrected the grievance and refiled. And, in this case, it appears that Verheyen informally addressed the substance of the grievance in his February 16, 2018 letter to the plaintiff. Dkt. No. 62-5. The remaining grievances did not complain about the vegan diet or the lack of Halal meat, but dealt with food quality issues, service issues and cleanliness issues.

The court also notes that the undisputed record shows that well before the defendants had an opportunity to meaningfully address the plaintiff's complaints about the vegan diet, the plaintiff had decided to file a lawsuit under §1983. In his January 26, 2018 correspondence through the OMS

system, he stated that he was "filing the 1983," despite having filed a grievance only three days before. Dkt. No. 68-1 at 1. This suggests the plaintiff did not intend to exhaust his administrative remedies because he did not allow the grievance procedure to play out before threatening to file a lawsuit. In his correspondence through the OMS system on February 16, 2018 (the same date he filed a flurry of food-related grievances), the plaintiff stated that he did not want to give Aramark and the defendants the "satisfaction of beating [him]." Dkt. No. 68-1 at 3. The plaintiff's desire to somehow defeat Aramark is the opposite of the rationale for the exhaustion requirement, which "is to allow prison officials time and opportunity to respond to complaints internally before an inmate initiates litigation." Dye, 2007 WL 3306771 at *5 (citing Porter v. Nussle, 534 U.S. 516, 524-525 (2002)).

The plaintiff did not file a grievance complaining that the defendants' proposed solution of providing mostly vegan meals with four meals per week containing Halal meat violated his rights. While he filed two grievances in January complaining that vegan meals were not Halal, once the jail and Aramark addressed those complaints by providing Halal meat four times a week, he did not file a grievance complaining of that solution. Not only is there no record evidence that he filed a complaint about the four-meal-per-week solution, but the record indicates that he had no intention of exhausting his administrative remedies on that issue and that he intended to go straight to federal court. The plaintiff failed to exhaust his administrative remedies, and

the court grants summary judgment in favor of all defendants and accordingly denies the plaintiff's motion for summary judgment.

Because the court grants summary judgment on exhaustion grounds, the court does not have the discretion to address the merits of the plaintiff's First Amendment and RLUIPA claims. Similarly, the court will also not address the qualified immunity arguments nor the arguments regarding Aramark's liability under Monell v. Dept. of Social Srvcs. of the City of New York, 436 U.S. 658 (1978).

## III. CONCLUSION

The court **GRANTS** the plaintiff's motion to file a sur-reply brief. Dkt. No. 96.

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 55.

The court **GRANTS** defendants' motions for summary judgment. Dkt. Nos. 59, 60.

The court **DISMISSES** this case and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal

Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 31st day of March, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**